UNITED STATES of America

v.

Lamont JOHNSON, et al., Defendants.

No. 4:16–cr–00019

United States District Court,
M.D. Pennsylvania.

Signed 05/11/2016

**MEMORANDUM**

Matthew W. Brann, United States District Judge

## I. BACKGROUND

On February 11, 2016, a federal grand jury sitting in Williamsport, Lycoming County, Pennsylvania returned a superseding indictment that charged the Defendants in this matter with conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846 and § 841 and firearms offenses in violation of 18 U.S.C. § 922(g)(1) and § 924(a). Critical to the investigation were certain interceptions of Defendants' wire and electronic communications authorized by this Court.

On November 20, 2015, the Court approved the initial interception of oral, wire, and electronic communications made by Defendants and others over cellular telephone facilities. That authorization was later extended on December 22, 2015. On January 13, 2016, a second order issued authorizing interception of wire and electronic communications on additional telephones, which the results from the first interception period indicated were receiving forwarded calls from the initial target phones or were otherwise involved in the alleged conspiracy.

Thorough applications and affidavits made by the United States and certain of its officers in support of its request to conduct electronic surveillance were filed with the Court under seal. Specifically, certain law enforcement officers submitted affidavits totaling nearly one hundred and fifty pages that detailed those aspects of their investigations warranting authorization of the wiretaps.

The Government reported detailed findings to the Court as to status of the investigation once each ten-day period while the interceptions remained active. In addition, following the completion of each of the interception periods, the authenticity of the audio recordings was attested to and said recordings were received in-person by the Court from certain representatives of the Government and law enforcement officers.

All of the search warrant materials were filed with the Court under seal, and remain under seal at this time. Among other details, the reports reveal information as to uncharged third-parties, cooperating third-parties, unidentified phone numbers, law enforcement officials, and representatives for the Government—information

gathered not only from the Defendants' own communications and data but also from summaries written by the affiants that summarize and place in context the communications. As the Government states, "[s]everal of the uncharged interceptees are the subject of ongoing investigation by the FBI and [the Pennsylvania State Police]."[1] Moreover, the sealed documents contain descriptions of investigative tactics and the broader status of this operation, which to the Court's knowledge, remains open and ongoing.

On March 9, 2016, pursuant Federal Rule of Criminal Procedure 16, the United States filed a sealed ex parte motion for a protective order. The motion asked the Court to authorize a controlled disclosure to Defendants of the applications, affidavits, orders, ten-day reports, and wire and electronic recordings made in connection with the subject surveillance, as well as related applications and orders for pen registers, trap and trace devices, and geographic locations of cellular telephones authorized by this Court. The motion also requested controlled disclosure of warrants, applications, affidavits, and related reports made in connection with search warrants that were authorized by this Court. The following items were the subject of the protective order:

Item 1. DVD: T–III (audio and electronic), Pen Registers, and CDR All Inclusive

Item 2. CD: T–Ill All Inclusive, Orders, Applications,

Item 3. CD I of 2: T–III Surveillance

Item 4. CD 2 of 2: T–III Surveillance

Item 5. CD: Pen Register Applications and Orders All Inclusive

Item 6. CD: Search Warrants, Vehicles, phone, residences and motel rooms

In pertinent part, the protective order: (1) requires counsel for Defendants' and counsels' staff to keep the protected items secure and confidential; (2) forbids defense counsel from copying, reproducing, or disclosing the protected items in any form, except to the extent that counsel may discloses the items' contents to their clients while retaining control over such items at all times; and (3) requires defense counsel to keep secure and confidential any personal identifiers contained in the protected items.[2]

To the extent that defense counsel deems it necessary to disclose the contents of the protected items to third parties in preparation for their client's defense, defense counsel must also request under seal with a copy to the Government, an order authorizing such disclosure.[3] In such event, defense counsel is responsible for removing personal identifiers in the disclosed portions of the evidence.[4] Defense counsel must also obtain and file with the Court a signed acknowledgment by the third party agreeing to abide by the terms of the protective order.[5] The protective order Defense counsel must return the protected items to the government not later than twenty days following the latter of sentencing, any other disposition of the charges, or conclusion of a direct appeal.[6]

In support of its motion for the protective order, the Government stated that "[t]he electronic surveillance and search

1. ECF No. 229 at 9.

2. ECF No. 229 at 1–3.

3. Id. at 3.

4. Id. at 4.

5. Id. at 5.

6. Id. at 4–5.

warrant materials contain sensitive and confidential information regarding sources of information, locations, individual identifying information, and information relevant to on-going criminal investigations of individuals not charged in the indictment."[7] Given those reasons, the Court granted the Government's motion to institute the protective order.

Moreover, by way of further support, the Government explained that the intercepted conversations were likely to "contain conversations, in whole or in part, of individuals not included in the indictment."[8] As the Government quite reasonably anticipated, "If the disclosed materials are made available to the press and general public the defendants 'right to a fair' trial, as well as the rights of persons not charged in the indictment, may well be affected."[9]

On April 1, 2016, counsel for Defendants filed a motion to vacate the protective order, with Edward J. Rymsza, Esquire, submitting the motion on behalf of all Defendants.[10] According to Defendants, the protective order is "overbroad impractical and unwarranted and not supported by a compelling basis."[11] Defendants further contend that the Government "failed to make any particular factual demonstration of the need for such a protective order."[12]

I believe that the Defendants go wrong with both arguments. In accordance with the following reasoning, I hold that the protective order is valid as a matter of law and appropriate given the particular factual circumstances of the underlying investigation. As explored more fully below, the Government has demonstrated good cause to implement and sustain the protective order. In addition, the order is sufficiently tailored to permit Defendants to adequately prepare for trial.

## II. LAW

In <u>Alderman v. United States</u>, the Supreme Court of the United States wrote that "the trial court can and should, where appropriate, place a defendant and his counsel under enforceable orders against unwarranted disclosure of the materials which they may be entitled to inspect."[13] "We would not expect the district courts to permit the parties or counsel to take these orders lightly," the Court admonished.[14] In such cases, "a defendant may need or be entitled to nothing else," because no defendant "will have an unlimited license to rummage in the files of the Department of Justice."[15]

Federal Rule of Criminal Procedure 16 governs discovery in the federal criminal context. Subpart (d)(1) of that rule, entitled "Protective and Modifying Orders" enables the court to regulate discovery by implementing a protective order. That subpart reads as follows:

> At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief. The court may permit a party to

---

7. ECF No. 1 at 3.

8. <u>Id.</u> at 3–4.

9. <u>Id.</u> at 4.

10. ECF No. 225. The motion notes that counsel for all of the co-defendants concur, except for counsel for co-defendants Troy Brown and Donald Avery, from whom no response was received. <u>Id.</u> at 4.

11. <u>Id.</u> at 3.

12. <u>Id.</u>

13. 394 U.S. 165, 185, 89 S.Ct. 961, 973, 22 L.Ed.2d 176 (1969).

14. <u>Id.</u>

15. <u>Id.</u>

show good cause by a written statement that the court will inspect ex parte. If relief is granted, the court must preserve the entire text of the party's statement under seal.

"Although the rule does not attempt to indicate when a protective order should be entered, it is obvious that one would be appropriate where there is reason to believe that a witness would be subject to physical or economic harm if his identity is revealed."[16]

■ "[S]imply because courts have the power to grant orders of confidentiality does not mean that such orders may be granted arbitrarily."[17] Instead, "[c]ourts may issue protective orders 'for good cause.' "[18] "Good cause is established on a showing that disclosure will work a clearly defined and serious injury to the party seeking closure. The injury must be shown with specificity. Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not support a good cause showing."[19] "The good cause determination must also balance the public's interest in the information against the injuries that disclosure would cause."[20]

■ "[W]hen there is an umbrella protective order 'the burden of justifying the confidentiality of each and every document sought to be covered by a protective order remains on the party seeking the protective order.' "[21] "That does not mean, however, that the party seeking the protective order must necessarily demonstrate to the court in the first instance on a document-by-document basis that each item should be protected."[22]

In United States v. Wecht, the United States Court of Appeals for the Third Circuit applied the "good cause" multi-factor balancing test set forth in its prior decision, Pansy v. Borough of Stroudsburg.[23] "Pansy applies to a determination of 'good cause' under Rule 16(d)(1). This is because the Third Circuit in Wecht applied Pansy to the determination of good cause over discovery materials in a criminal case pursuant to Rule 16(d)(1)."[24]

■ Wecht and Pansy set forth the following non-exhaustive factors for district courts contemplating the issuance of a protective order to consider:

(1) whether disclosure will violate any privacy interests;

(2) whether the information is being sought for a legitimate purpose or for an improper purpose;

(3) whether disclosure of the information will cause a party embarrassment;

(4) whether confidentiality is being sought over information important to public health and safety;

16. Fed. R. Crim. P. 16, Advisory Committee Notes, 1974 Amendment (citing Will v. United States, 389 U.S. 90, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967)).

17. Pansy v. Borough of Stroudsburg, 23 F.3d 772, 785 (3d Cir. 1994) (Cowen, J.).

18. United States v. Wecht, 484 F.3d 194, 211 (3d Cir. 2007) (Fuentes, J.) (quoting Fed. R. Crim. P. 16).

19. Id. (internal quotation marks omitted).

20. Id.

21. Wecht, 484 F.3d at 211 (quoting Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1122 (3d Cir.1986) (Becker, J.)).

22. Cipollone, 785 F.2d at 1122.

23. See Wecht, 484 F.3d at 211 (citing 23 F.3d 772, 787 (3d Cir. 1994)).

24. United States v. Luchko, No. CRIM.A. 06–319, 2007 WL 1651139, at *6 (E.D. Pa. June 6, 2007) (Yohn, J.).

(5) whether the sharing of information among litigants will promote fairness and efficiency;

[6] (6) whether a party benefitting from the order of confidentiality is a public entity or official; and

(7) whether the case involves issues important to the public.[25]

Where appropriate, Pansy also suggests that the district court consider the contemplated protective order's " "effect on disclosure of government records to the public under state and federal freedom of information laws."[26]

## III. ANALYSIS

For the reasons that follow, the protective order will remain in full force and effect. Upon careful consideration of the parties' arguments, I hold both that the totality of the evidence established good cause for the issuance of the protective order and that the protective order permits disclosure in a manner sufficient to facilitate the defendant's preparation for trial.

## A. The Totality Of The Evidence, Including The Wiretap Applications, Established Good Cause For The Issuance Of The Protective Order.

■ The Government argues, and is correct, that good cause arises in the first instance from the contents of the wiretap applications, affidavits and related documents. As described above, those documents, which tally approximately 150 pages each, contain several types of information warranting issuance of a protective order.

The first example of that information is a detailed explanation of the Government's use of several confidential sources and cooperating witnesses to establish the initial probable cause showing. Although third-party sources and cooperating witnesses remain unnamed throughout the application material, significant details as to those individuals are listed throughout the materials, which taken together, would reasonably allow identification of subjects whose identities should remain anonymous for several obvious reasons.

For instance, a sealed affidavit accompanying the initial wiretap application contains the following information about confidential human sources and cooperating witnesses: (1) the particular defendant(s) against whom the third-party supplied information; (2) the criminal history of the third-party; (3) the past record of cooperation of the third-party; (4) the prior criminal record of the third-party and the state or federal nature of such record; (5) whether the third-party is cooperating to achieve a more lenient sentence in a pending state or federal matter; (6) the particular type of consideration the third-party has received for his or her cooperation; (7) the geographic locations at which the third-party typically collects his or her information; and (8) the third-party's involvement in the instant heroin conspiracy, if applicable.

■ "[T]he public, in general, has an interest in protecting the investigatory process."[27] Specifically, "the public also has a more wide-reaching interest in maintaining the confidentiality of these documents that involves protecting people who pro-

---

**25.** Luchko, 2007 WL 1651139, at *6–7 (citing Wecht, 484 F.3d at 211 and Pansy, 23 F.3d at 787–91).

**26.** Luchko, 2007 WL 1651139, at *7 (citing Pansy, 23 F.3d at 791).

**27.** McKenna v. City of Philadelphia, No. CIV. A.98–5835, 2000 WL 1521604, at *2 (E.D. Pa. Sept. 29, 2000).

vide information to investigators and protecting the integrity of the investigative process, itself."[28] Such is particularly true where a small sample of innocuous documents is "intertwined with confidential material" and therefore inseparable from those confidential documents even with reasonable effort.[29]

■ This Court finds the foregoing principles obvious in light of the justification that "individuals who might provide such information regarding any incident in the future must be protected."[30] In that fashion, the grant or denial of a given protective order necessarily will have a consequential impact on the decision of future third-parties as to whether they will cooperate in future investigations. Thus, determination of the validity of a protective order should, in my view, be concerned just as much with the privacy interests of the present third-party witnesses as it should be with those future third-party witnesses whose decision to cooperate could very well be influenced by the assurance of the Government that protective orders are appropriately issued in a given forum.

Next, the Government argues that the protective order was justified because it shields from public view the identities and professional affiliations of certain law enforcement officers, both plain clothes and undercover, as well as a number of sensitive investigative techniques, which are

particularly effective in the context of drug conspiracies operating in a manner such as this one. The Government contends that such disclosure could jeopardize not only the continued efficacy of future investigations but also risk the safety and security of its officers. I agree.[31]

In the analogous context of the law-enforcement exception to the Freedom of Information Act, one federal court has concluded that files are rightly shielded from public access where "they reveal specific details of surveillance techniques, including equipment used and location and timing of use, the revelation of which could compromise [the agency's] ability to conduct future investigations."[32] Although the movants in that case, like the Defendants here, advanced the argument that wrongdoers nevertheless "likely know that they are subject to surveillance," nondisclosure was nevertheless appropriate because "the details of the surveillance techniques are unknown to them."[33] As the Court concluded, "documents which disclose the location and timing of such surveillance could be reasonably expected to risk circumvention of the law."[34]

Last, the Government points out that the electronic records from the wiretaps continued in connection with this matter contain electronic communications of more than 50 individuals who have not been charged, in addition to those belonging to the 19 co-defendants. The materials also

---

**28.** McKenna v. City of Philadelphia, No. CIV. A.98–5835, 2000 WL 1521604, at *2 (E.D. Pa. Sept. 29, 2000).

**29.** See id. at *4–5.

**30.** McKenna v. City of Philadelphia, No. CIV. A.98–5835, 2000 WL 1521604, at *2 (E.D. Pa. Sept. 29, 2000).

**31.** By way of example, it has recently come to this Court's attention that the authoring co-

defendant here was charged on May 4, 2016 with homicide in the Municipal Court of Philadelphia County. See MC–51–CR–0012729–2016.

**32.** Showing Animals Respect & Kindness v. U.S. Dep't of Interior, 730 F.Supp.2d 180, 199–200 (D.D.C. 2010).

**33.** Id. at 200.

**34.** Id.

inevitably contain personal identifiers and other sensitive information.

■■ "The privacy interests of the non-public persons named in the [investigative] documents (i.e., victims, witnesses, and in some reports, confidential informants) have an even greater interest in having their identities concealed."[35] Thus, protection of such third-party information is appropriate where the contested documents "contain evidence of private and embarrassing activity concerning third parties, which ... would cause "unnecessary or serious pain on parties" who ... "are entitled to such protection."[36]

I find that the privacy interests of the uncharged third-parties who appear scattered throughout the application materials and the audio results of the interceptions vastly outweigh any countervailing interest in favor of making the documents publicly accessible or accessible by the Defendants under less stringent requirements. For instance, frequently throughout the wiretap materials, those materials reveal the names, phone numbers, and contents of the voice and text message conversations that the charged Defendants exchanged with several uncharged individuals.

■■ Where "there is highly embarrassing information that is irrelevant to the investigation and that relates to third parties," then "this factor weighs heavily in favor of a protective order."[37] This Court certainly agrees. I find it particularly troubling to consider the personal and economic damage likely to result should an uncharged third-party's identity be revealed as a consequence of my revoking the protective order. Moreover, I consider

it significant that information as to uncharged third-parties is intertwined with the remainder of the interception's results so as to make separation or redaction exceedingly impracticable even with reasonable effort by the Government.

As the Honorable Edward R. Becker, writing for the Third Circuit in Cipollone v. Liggett Group, explained:

> It is correct that the burden of justifying the confidentiality of each and every document sought to be covered by a protective order remains on the party seeking the protective order; any other conclusion would turn Rule 26(c) on its head. That does not mean, however, that the party seeking the protective order must necessarily demonstrate to the court in the first instance on a document-by-document basis that each item should be protected. It is equally consistent with the proper allocation of evidentiary burdens for the court to construct a broad "umbrella" protective order upon a threshold showing by one party (the movant) of good cause. Under this approach, the umbrella order would initially protect all documents that the producing party designated in good faith as confidential. After the documents delivered under this umbrella order, the opposing party could indicate precisely which documents it believed to be not confidential, and the movant would have the burden of proof in justifying the protective order with respect to those documents. The burden of proof would be at all times on the movant; only the burden of raising the issue with respect to certain documents would shift to the

---

**35.** Haber v. Evans, 268 F.Supp.2d 507, 512 (E.D. Pa. 2003).

**36.** Luchko, 2007 WL 1651139, at *7 (quoting Pansy, 23 F.3d at 787).

**37.** Id. at *8.

other party.[38]

Thus, "the umbrella order approach has several advantages over the document-by-document method ... in a complex case" because "use of umbrella orders in the district court is a useful method of dealing with large-scale discovery."[39]

The items the protective order covers consist of a large volume of evidence including numerous intercepted communications, multiple search warrants and affidavits, hundreds of pages of pen register and wiretap applications, affidavits, orders, and interim reports. Accordingly, I agree with the Government that "the volume of materials precludes detailed, document-by-document redaction of sensitive information and personal identification information" and in conjunction with the showing of good cause, warranted implementation of the order.

Though the preceding discussion implicates several, if not all, of the Pansy factors for the determination of good cause necessary to issue a protective order, the Court will explicitly apply those factors for the record now. The first factor, violation of privacy interests, weighs heavily in favor of the order, particularly in light of the third-party information detailed throughout the interception's records. The second factor, the legitimacy of the purpose for which the information is sought, remains neutral, as both the Government and the Defendants have advanced legitimate uses. The third factor, whether disclosure will cause embarrassment, weighs heavily in favor of the order for most of the same reasons attributable also to the first factor.

The fourth factor, which balances confidentiality with health and public safety, also weighs heavily in favor of the order. Specifically, I find it apparent that the public health and safety is advanced by a reduction in the number of drug offenders that infiltrate our communities, that reduction in offenders is furthered by thorough, effective law enforcement efforts, and those successful efforts require keeping the Government's and its agent's investigative tactics concealed from offenders still at large or third-parties contemplating participation in drug rings.

The fifth factor, which considers fairness and efficiency, also weighs strongly in favor of the order. As the United States District Court for the Eastern District of Pennsylvania has previously described in a related matter, "entry of a protective order in this instance will actually make easier the sharing of information between defendants and the government because it will permit defendants, rather than the government, to sift through the materials to determine what is or is not relevant to their defense."[40] "Moreover, redacting information concerning uncharged individuals alone would be an enormous, if not impossible, task that would take months to accomplish, thereby further delaying trial."[41]

The Court agrees with the reasoning in Luchko that inspection by the nineteen Defendants and their counsel expedites the trial timeline in contrast with delegating that task to a single attorney for the Government. Moreover, the order permits the Defendants to review the documents without prior censorship or redaction by the Government. This method of discovery also avoids wasting the Court's and the parties' time with subsequent discovery disputes involving claims of privilege, wrongful re-

---

38. 785 F.2d at 1122 (internal footnote omitted).

39. Id. at 1122–23 (internal footnotes omitted).

40. Luchko, 2007 WL 1651139, at *8.

41. Id.

daction, etc., a significant number of which, based upon the pace of the filing of pretrial motions thus far and the sheer volume information, I would anticipate being raised.

The sixth factor, which asks whether a public entity or official benefits from the protective order, also strongly favors its issuance. The basis of this factor is that "[t]he public's interest is particularly legitimate and important where, as in this case, at least one of the parties to the action is a public entity or official."[42]

The Government will always be a party in federal criminal actions that seek coverage of a protective order, but the Government is not the kind of public official or entity that this factor contemplates. The level of public interest and the public's right-to-know in this case is distinct, for instance, from one involving a public official defendant. Moreover, the Government and its agents are not the primary beneficiaries of such an order. Instead, those beneficiaries are the uncharged third-parties whose anonymity and identities are otherwise preserved by issuance of a protective order. The public's interest as to the identity of those private individuals is comparatively lower than in a case involving a public official. Therefore, this factor also favors issuance of the order, as the protective order withholds very little, if any, information that touches upon matters of public concern.

Relatedly, the seventh factor, which asks whether the case involves issues important to the public, weighs in favor of issuing the protective order, as this case implicates no issues important to the public concern. To the extent that it does involve issues important to the public, such as the safety of our communities, then those issues counsel in favor of effective long-term policing and consequently, in favor of the protective order.

Thus, in applying the Pansy factors to the instant good cause determination, I hold that six of the seven factors weight strongly or heavily in favor of the issuance of the protective order. Accordingly, the Government has advanced good cause for the protective order implemented here.

## B. The Protective Order Permits Disclosure In A Manner Sufficient To Facilitate The Defendant's Preparation For Trial.

 The Defendants also contend that the protective order hampers their ability to develop an adequate defense. The Court considers that a serious concern in contemplating the issuance of a protective order in a federal criminal matter, and now turns to that issue independent of its prior good cause determination. As the following analysis indicates, however, that claim by Defendant is vastly overstated. Because the protective order permits disclosure in a manner sufficient to facilitate preparation of a competent defense, the protective order will stand.

The Court agrees with the Government that the protective order is sufficiently tailored to permit preparation for an adequate defense while simultaneously avoiding improper disclosures. Defendants attest that "none of the defendants would have free reign with material."[43] The documents would be safe regardless, the defense contends, as most of the Defendants are incarcerated, where mail is scrupulously screened.[44] What's more, every Defendant would comply with the terms of the protective order for fear of incurring

---

42. Pansy, 23 F.3d at 786.

43. ECF No. 225 Ex. 1 at 6.

44. Id.

additional penalties.[45] I am far from the only federal judge who would look askance at such assurances.

As the Government rightly points out, "although some of the defendants are in custody, they have access to prison telephones and are able to communicate concerning the contents of the protected items with co-defendants who have been released and other individuals."[46] Moreover, "[t]he co-defendants who have been released pending trial, if provided with copies of the protected items, can readily disseminate them to the co-defendants through prison mail and telephones, despite the best efforts of prison staff."[47] In its discretion, the Court agrees that, given the sensitive nature of the covered documents, Defendants' "just trust us" approach is simply inadequate as a matter of law.

When all is said and done, counsel for Defendants who claim they will be responsible for safeguarding the voluminous sealed evidence in this matter would do well to remember that the integrity of that evidence is such that once dispersed, can very well be lost forever with damaging consequences to law enforcement authorities and other third-parties. In light of that recognition, counsel can most certainly understand this Court's desire to avoid the costs associated with derivative sanctions litigation stemming from breaches of the protective order.

In addition, the Court considers the heavy use of social media among the current Defendants as a related factor in its determination on this point. As the Government notes, in this digital era, on-line social media affords a fast and efficient means of disseminating information to a wide group of recipients."[48] The concern is particularly apt where, as in this case, the underlying investigatory documents indicate that the defendants used several social media sites and related programs to communicate amongst themselves and with uncharged individuals.

In my view, the prevailing argument is that "the order does not restrict the access of the defendants' counsel and staff to those items, nor does it limit counsel's ability to review those materials with the defendants."[49] In my view, requiring the Defendants to review the protected documents in the presence of counsel in no way impairs the effectiveness of their proffered defenses.

In United States v. Moore, for example, the United States District Court for the Eastern District of Pennsylvania previously addressed this exact argument and held that a defense attorney "was not ineffective for failing to give [his client] copies of this discovery prior to trial or prior to filing his appeal" where the court had instituted a protective order that "prohibited defense counsel from giving [his client] copies of certain discovery documents, but permitted counsel to review such documents with [him] when planning his defense and pursuing his appeal."[50]

Furthermore, the protective order at issue permits defense counsel to seek leave of court in order to authorize third-party disclosure to witnesses and experts in preparing their clients' defenses. That requirement, along with the third-party's agreeing to abide by the terms of the

---

45. Id.

46. ECF No. 229 at 9.

47. Id.

48. Id.

49. ECF No. 229 at 10.

50. United States v. Moore, No. CIV.A. 12–2193, 2013 WL 3742414, at *5 (E.D. Pa. July 17, 2013).

agreement, is an apparent necessity for a protective order to hold its effect rather than risk circumvention through third-party disclosure. In addition, such provisions significantly enhance the ability of defense counsel here to present the relevant documentation to verified third-parties in order to build an adequate defense.

A concluding, but important point in this Court's mind is that the Defendants fail to identify how, as a matter of practice, the protective order hinders the representation of their clients whatsoever. Instead, the Defendants suggest that the protective order is "fundamentally inconsistent with the basic notions of a free society that one of its own can be prosecuted without full and unfettered access to all the evidence."[51] That is a grand statement, but it falls well short of establishing the type of prejudice that would necessitate vacating the protective order in this matter.

## IV. CONCLUSION

In accordance with the foregoing analysis, I hold that the protective order shall remain in full and effect, both because the totality of the evidence established good cause for the issuance of the protective order and because the protective order permits disclosure in a manner sufficient to facilitate the Defendants' preparation for trial.

Moreover, the Court views Defendants' papers here as largely divorced from the applicable circuit authority—papers that appear more willing to parade amongst glittering constitutional generalities—than to grapple with the facts and the law at hand. Such an approach, defense counsel should know, merits little weight in the federal forum. Despite the expenditure of measurable energy, the Court has per-ceived from counsel for Defendants' papers here comparably faint light.

Finally, upon reviewing Defendants' papers, the Court cannot help but to take issue with rhetoric that characterizes counsel for the Government's decisions as "calculated," "studiously ignorant," "simply ignorant," "utterly failing," "self-serving," "conclusory," "bare bones," "one-sided," and "hard to fathom." Although this Court would never fault a lawyer for competently performing his duties as his client requests, such descriptors are, in my eyes, signs of an advocate who has lost sight of the long-game.

An appropriate Order follows.